# In the United States Court of Federal Claims

No. 20-1237C
(Filed: March 25, 2022)*
**\*Opinion originally filed under seal on March 16, 2022**

|  |  |  |
|---|---|---|
| TEJA RAVI, | ) | |
| | ) | |
| | ) | Motion to Dismiss; RCFC 12(b)(1); |
| Plaintiff, | ) | Sovereign Capacity Doctrine; RCFC |
| | ) | 56(d); RCFC 15; Futility |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

*Amy E. Norris*, Washington, DC, for plaintiff.

*Meen Geu Oh*, Civil Division, United States Department of Justice, Washington, DC, with whom were *Brian M. Boynton*, Acting Assistant Attorney General, *Martin F. Hockey, Jr.*, Acting Director, and *Eric P. Bruskin*, Assistant Director, for defendant.

## OPINION

**FIRESTONE**, *Senior Judge.*

Between 2018 and 2019, plaintiff Teja Ravi,[1] a citizen of India, enrolled at and made tuition payments to the University of Farmington. At the time of his enrollment, Mr. Ravi did not know that the University of Farmington was a fictitious school staffed and operated by agents from United States Immigration and Customs and Enforcement

---

[1] Mr. Ravi's legal name is Ravi Teja Tiyagurra. Def.'s Supp. Br. at 1 n.1, ECF No. 24. However, the parties continue to refer to the plaintiff as Teja Ravi and, for consistency, so will the court.

(ICE) as part of an undercover law enforcement operation whose purpose was to expose student visa fraud. In 2019, after ICE ceased operating Farmington and began pursuing enforcement actions, Mr. Ravi left the United States and returned to India. In this action, Mr. Ravi seeks the return of his tuition payments, alleging that the government breached a contract with him when it did not provide him legitimate educational services.

Now pending before the court are the government's motion to dismiss Mr. Ravi's amended complaint, or, in the alternative, motion for summary judgment, as well as Mr. Ravi's requests for additional discovery and his motion to further amend his complaint. As discussed in more detail below, the court **GRANTS** the government's motion to dismiss Mr. Ravi's amended complaint for lack of subject matter jurisdiction because the sovereign capacity doctrine bars this court from hearing Mr. Ravi's contract claims. The government's alternative motion for summary judgment is **DISMISSED AS MOOT.** Mr. Ravi's requests for further discovery are **DENIED** as futile, and Mr. Ravi's motion to amend the complaint is also **DENIED** as futile.

## I.    STATUTORY AND REGULATORY BACKGROUND

The laws of the United States generally require foreign citizens to obtain a visa before entering the country. One type of visa the United States offers to foreign citizens is the F-1 nonimmigrant academic visa, sometimes called a student visa. *See* 8 U.S.C. § 1101(a)(15)(F)(i). The F-1 visa allows "nonimmigrant students" to come to the United

States for a specified time period to pursue a "full course of study"[2] at an approved

educational institution.  *See id.*

Students seeking an F-1 visa are subject to certain requirements.  The students

must apply and be accepted to a school certified by the Student and Exchange Visitor

Program (SEVP), which is overseen by the Department of Homeland Security (DHS).

Def.'s Supp. Br. at 3 (citing U.S. Dep't of State, Bureau of Consular Affairs, Student

Visa Page, available at https://travel.state.gov/content/travel/en/us-visas/study/student-

visa.html (last accessed March 16, 2022)); *see* 8 C.F.R. § 214.3.  SEVP schools are

authorized to issue students a "Certificate of Eligibility for Nonimmigrant Student

Status," otherwise known as a Form I-20, which demonstrates that the holder meets all

standards of admission for the school and has been accepted for a full course of study.

*See* 8 C.F.R. § 214.2(f)(1)(i)(A).  Upon receiving the Form I-20, the student must

complete an F-1 visa application, and, if granted an F-1 visa, must pursue a full course of

study for the entire time period specified in the visa (subject to certain exceptions not

relevant here).  *See* 8 C.F.R. § 214.2(f)(5)(i).  Visa holders may work for pay in addition

to participating in their full course of study by obtaining a Form I-20 authorizing

"curricular practical training" or CPT.  *See* 8 C.F.R. § 214.2(f)(10)(i).  A student is

required to return to his or her home country within 60 days of when the approved course

---

[2] A "full course of study" is defined in detail in 8 C.F.R. § 214.2(f)(6), which generally requires
a certain number of credit or clock hours depending on the type of educational program attended
under a student visa.

of study is complete, or within 15 days of when the individual ceases to maintain a full course of study.  8 C.F.R. § 214.2(f)(5)(iv).

## II.   FACTUAL BACKGROUND

The following undisputed facts relevant to this opinion are taken from Mr. Ravi's amended complaint and certain unchallenged parts of the exhibits to the parties' briefs.

### A.   The University of Farmington

In December 2014, in consultation with the United States Attorney's Office in the Eastern District of Michigan, government officials devised a three-year law enforcement strategy called Operation Paper Chase.  Def.'s Supp. Br., Ex. 2 ¶ 8 ("Webber Decl."). Operation Paper Chase was a certified undercover law enforcement operation designed to target individuals fraudulently maintaining their student visa status while working in the United States, without having to attend classes or maintain a full course of study, by paying tuition to a collaborating educational institution in exchange for a Form I-20 authorizing CPT.  Def.'s Supp. Br. at 6; Def.'s Appx49, ECF No. 33; Webber Decl. ¶ 8; *see also* Am. Compl. ¶ 1, ECF No. 8.  This type of student visa fraud is known as a "pay to stay" scheme.  Def.'s Supp. Br. at 5.  Operation Paper Chase was also designed to target recruiters who assisted students in participating in the "pay to stay" scheme.  *Id.* at 7.  The day-to-day aspects of the operation were carried out by agents of Homeland Security Investigations (HSI) in ICE.  Webber Decl. ¶¶ 8-9; *see also* Am. Compl. ¶ 1.

The setting for the undercover operation was the University of Farmington, which was presented as "a State of Michigan licensed and nationally accredited private university."  Def.'s Appx111; *see also* Webber Decl. ¶ 9; Am. Compl. ¶ 1.  To set up the

operation, HSI undercover agents secured and staffed a commercial office building in the Detroit, Michigan area and, for purposes of the operation, obtained state accreditation for the school. Webber Decl. ¶ 9; Am. Compl. ¶¶ 8-11. Undercover agents were also assigned to "maintain[] a website and a significant and active social media presence." Def.'s Appx111; Am. Compl. ¶¶ 13-15. The HSI agents posing as Farmington administrators accepted applications and corresponded with potential and enrolled Farmington students. *See* Webber Decl. ¶ 11; Am. Compl. ¶ 22.

To ensure that Operation Paper Chase complied with the law governing such undercover operations, HSI followed the certification procedures in two statutes: 8 U.S.C. § 1363a and 19 U.S.C. § 2081.[3] Webber Decl. ¶ 8 (referencing certification materials); *see, e.g.,* Def.'s Appx6 (certification memorandum). These statutes authorize DHS through its ICE agents to lease commercial spaces, "establish or acquire" commercial entities, and "operate" these "entities on a commercial basis." 8 U.S.C. § 1363a; 19 U.S.C. § 2081. These statutes also explain the procedural steps ICE must undertake and the approvals ICE must obtain to exercise the undercover authority in the statutes. *Id.* Once approved, the statutes authorize ICE to use "proceeds" retained in the operation to recoup costs expended in the undercover efforts. *Id.*

---

[3] The Title 8 statute applied to what was formerly the Immigration and Naturalization Service (INS), and the Title 19 statute applied to what was formerly the Customs Service. The investigative and enforcement functions of INS and the Customs Service were later combined and reorganized under ICE, which is part of DHS. Congress has conveyed to DHS the authority granted to government officials under the statutes. Def.'s Supp. Br. at 9 n.6 (citing 6 U.S.C. § 557).

### B.      Mr. Ravi's Enrollment at Farmington

Mr. Ravi is a citizen of India who, at the time he applied to the University of Farmington in February 2018, was already enrolled at Northwestern Polytechnic University in California under an F-1 visa.  Am. Compl. ¶ 29; Def.'s Supp. Br. at 11.  In March 2018, Mr. Ravi enrolled at the University of Farmington in its "Information Technology" program and received from Farmington a Form I-20.  Am. Compl. ¶¶ 17, 29; Def. Supp. Br. at 11.  From the time of his enrollment through January 2019, Mr. Ravi paid Farmington $12,500 in tuition.  Am. Compl. ¶ 30; *see* Def.'s Supp. Br. at 11, 13.  During his entire time with Farmington, Mr. Ravi did not attend any classes or complete any assignments.  Am. Compl. ¶¶ 30-31.

In January 2019, HSI ceased operating Farmington and began enforcement actions related to Operation Paper Chase.  Webber Decl. ¶ 27; Def.'s Appx183; Am. Compl. ¶ 27.  After Mr. Ravi learned that Farmington was part of an undercover operation and enforcement actions began, Mr. Ravi returned to India.  Webber Decl. ¶ 28; *see* Pl.'s Supp. Resp., Ex. 7 ¶ 1, ECF No. 40 (Mr. Ravi's declaration, stating that he currently resides in India).

## III.     PROCEDURAL BACKGROUND

On September 21, 2020, Mr. Ravi filed his initial complaint in this court individually and on behalf of a class of similarly situated Farmington students.  Compl. ¶¶ 2-4, ECF No. 1.  According to Mr. Ravi, he understood the University to be a legitimate educational institution and, by paying tuition, he entered into a contractual relationship with the government for educational services.  *Id.* ¶¶ 9-33, 39-43.  Because

the government never provided those services, Mr. Ravi brings claims for breach of

contract and breach of the implied covenant of good faith and fair dealing.  *Id.* ¶¶ 39-49.

Among other things, he seeks that the action be certified as a class action,[4]

"compensatory, statutory and/or punitive damages" for breach of contract, "fraud,

negligent misrepresentation and false promises," and "equitable monetary relief,

including restitution and disgorgement."  *Id.* ¶ 50.

On January 8, 2021, the government filed a motion to dismiss the complaint under

Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims

(RCFC), arguing that Mr. Ravi failed to sufficiently allege two elements required to

establish a valid contract with the government:  that the government intended to enter into

an educational services contract with Mr. Ravi and that the HSI agents running

Farmington had actual authority to bind the government in a contract for educational

services.  Def.'s Mot. to Dismiss at 5-6, ECF No. 7.  The government also argues that Mr.

Ravi's claims should be dismissed under the sovereign capacity doctrine, which bars

contract claims that arise out of the government's sovereign actions.  *Id.* at 6-7.

After the government filed its motion to dismiss, on January 28, 2021, Mr. Ravi

filed an amended complaint under RCFC 15(a)(1)(B).  The amended complaint reiterates

the allegations of the original complaint and adds allegations that the HSI personnel

behind the University "had actual authority to bind the government in contract . . . ."

Am. Compl. ¶ 43; *see also id.* ¶ 8.  The amended complaint also alleges that the

---

[4] Mr. Ravi has not filed a motion for class certification and he is the only named plaintiff in this case.

government "ratified" the contracts for educational services with Farmington students when it "accepted the benefit of the contracts by keeping all tuition money paid by Plaintiff and class members under the contracts." *Id.* ¶ 44; *see also id.* ¶ 27.

After the government filed its reply brief in support of its motion to dismiss, the court held a status conference and ordered Mr. Ravi to file a supplemental brief regarding whether Mr. Ravi, as a citizen of India, had standing to sue under the Reciprocity Act, 28 U.S.C. § 2502.  *See* Joint Status Report Order, ECF No. 14.  The Reciprocity Act grants plaintiffs who are citizens of a foreign government the right to sue the United States in its courts only if a reciprocal right is afforded to an American citizen in the plaintiff's country.  28 U.S.C. § 2502.  In his supplemental briefing, Mr. Ravi argues, and the government agrees, that the Reciprocity Act does not bar Mr. Ravi's claims.  Pl.'s Supp. Br. at 1-3, ECF No. 17; Def.'s Supp. Resp. at 1-3, ECF No. 23.

The court also ordered the government to file a supplemental brief in support of its motion to dismiss or, in the alternative, a motion for summary judgment.  *See* Joint Status Report Order, ECF No. 14.  The court directed the government to address in its supplemental briefing a variety of topics, including "the statutory basis for the University of Farmington undercover operation and whether that operation was certified under the relevant statutes," whether the alleged educational services contract with Mr. Ravi was illegal and unenforceable, and whether the HSI agents operating the University of Farmington had the authority to bind the United States to an educational services contract

with Mr. Ravi.[5]  *Id.*  In its supplemental briefing, the government argues that Mr. Ravi's amended complaint should be dismissed or summary judgment should be granted in the government's favor for three reasons:  (1) the sovereign capacity doctrine bars Mr. Ravi's claims because those claims arise out of a certified undercover law enforcement action; (2) Mr. Ravi cannot plead or prove a mutuality of intent to contract or that HSI agents had the necessary authority to bind the United States to a contract for educational services; and (3) Mr. Ravi knew his conduct was illegal, and, therefore the doctrine of *in pari delicto* bars him from obtaining assistance from this court to recover his tuition money.  Def.'s Supp. Br. at 2.  The government attached to its supplemental brief evidence in support of these arguments, including affidavits from ICE personnel and the required certification documents for the Farmington undercover operation.  *See generally* Def.'s Appx6-255.

Supplemental briefing on the government's motion to dismiss, or, in the alternative, for summary judgment was completed on October 8, 2021.  Oral argument was held on January 13, 2022, and the government's motion is now pending.

Two other matters are also before the court.  First, Mr. Ravi makes a request in his supplemental briefing for further discovery, which the government opposes.  Pl.'s Supp. Resp. at 8-9, 14, 16, 21; Def.'s Supp. Reply at 3, 9-10, ECF No. 43.  Second, one day before oral argument, Mr. Ravi moved to amend his complaint to add another named plaintiff.  Mot. to Amend at 1, ECF No. 47.  Pursuant to the court's January 12, 2022

---

[5] The court also entered a protective order governing the disclosure of the evidence the government submitted in support of its supplemental brief.  *See* Protective Order, ECF No. 30.

order, ECF No. 49, the government at oral argument opposed the motion to amend, Tr.

20-23, ECF No. 51.

## IV.   DISCUSSION

Although the parties agree on this point, the court first addresses whether the

Reciprocity Act bars Mr. Ravi's claims.  The court will then turn to the government's

motion to dismiss, or, in the alternative, motion for summary judgment.  Finally, the

court will address Mr. Ravi's request for additional discovery and Mr. Ravi's motion to

amend his complaint to add another named plaintiff.

### A.      The Reciprocity Act Does Not Bar Mr. Ravi's Contract Claims

Because Mr. Ravi is a citizen of India, he must meet the requirements of the

Reciprocity Act, 28 U.S.C. § 2502, in order to pursue his claims before this court.  Under

the Reciprocity Act, "[c]itizens or subjects of any foreign government which accords to

citizens of the United States the right to prosecute claims against their government in its

courts may sue the United States in the United States Court of Federal Claims if the

subject matter of the suit is otherwise within such court's jurisdiction."  *Id.*  The Act

"burdens alien plaintiffs who invoke the process of the Court of Federal Claims with

showing that their home courts treat natives and American citizens equally when they

adjudicate claims brought against their home countries."  *El-Shifa Pharm. Indus. Co. v.*

*United States*, 378 F.3d 1346, 1354 (Fed. Cir. 2004).  The Act should not be interpreted

"rigidly" and does not require "the existence of an action in the foreign state of identical

nature or scope."  *Ferreiro v. United States*, 350 F.3d 1318, 1322 (Fed. Cir. 2003).

Rather, "[e]qual treatment is the paramount requirement of the Reciprocity Act."  *Id.*  A

plaintiff may satisfy the requirements of the Reciprocity Act with evidence—such as statutes, case law, treaties, or an affidavit from an experienced attorney or government official from the foreign state, *see Yifrach v. United States*, 145 Fed. Cl. 691, 697 (2019); *Humphries v. United States*, 44 Fed. Cl. 81, 82 (1999)—that demonstrates that "American citizens enjoy an equal standing with foreigners in actions against the foreign state," *Nippon Hodo Co. v. United States*, 285 F.2d 766, 767-68 (Ct. Cl. 1961).

In this case, the court agrees with Mr. Ravi and the government that Mr. Ravi has satisfied the requirements of the Reciprocity Act.  *See* Pl.'s Supp. Br. at 1-3; Def.'s Supp. Resp. at 1-3.  Mr. Ravi provides an affidavit from an experienced Indian attorney who is an Assistant Professor at a leading law school in India explaining that "an American citizen has a right to sue the Indian government in its courts under the existing constitutional as well as statutory scheme in India."  Pl.'s Supp. Br., Ex. A at 2.  In support, Mr. Ravi's supplemental brief and attached affidavit cite the Indian Constitution, Indian Civil Procedure Code Sections 9, 79, and 83, and case law.  *Id.* at 1-3, Ex. A at 2-9; *see also* Def.'s Supp. Resp. at 1-3 (citing Article 300(1) of India's Constitution and Sections 9, 79, and 83 of India's Code of Civil Procedure).  Taken together, these sources of law demonstrate that the Act does not bar Mr. Ravi's claims.

Article 300(1) of the Constitution of India authorizes suits against the Indian government:

> The Government of India may sue or be sued by the name of the Union of India and the Government of a State may sue or be sued by the name of the State and may, subject to any provisions which may be made by an Act of Parliament or of the Legislature of such State enacted by virtue of powers conferred by this Constitution, sue or be sued in relation to their respective affairs in the like cases as the Dominion of India and the corresponding Provinces or the corresponding

11

Indian States might have sued or been sued if this Constitution had not been enacted.

*See also* Pl.'s Supp. Br., Ex. A at 8 n.28, Ex. B; Def.'s Supp. Resp. at 2.  Likewise,

Section 79 of India's Code of Civil Procedure states:

> In a suit by or against the Government, the authority to be named as plaintiff or defendant, as the case may be, shall be – (a) in the case of a suit by or against the Central Government, the Union of India, and (b) in the case of a suit by or against a State Government, the State.

*See also* Pl.'s Supp. Br., Ex. A at 8 & n.27; Def.'s Supp. Resp. at 2.  In addition, Section

9 of India's Code of Civil Procedure confers Indian courts with jurisdiction over "all civil

suits."  Pl.'s Supp. Br., Ex. A at 8 & n.26 (noting a "civil court in India would have

jurisdiction to entertain" civil suits).  These provisions together provide that the

government of India is subject to civil lawsuits, with no limitations on who may bring

those claims.  *Id.*, Ex. A at 8 (explaining that Section 79 and Article 300 of the Indian

Constitution "provide[] that the Government of India may sue or be sued").

Section 83 of India's Code of Civil Procedure states that "alien friends[] may sue

in any Court otherwise competent to try the suit, as if they were a citizen of India."  *See*

*also* Pl.'s Supp. Br., Ex. A at 8-9 & n.29.  Alien friends under Section 83 are foreign

citizens whose government is not "at war with India," such as American citizens.  *Id.*

Section 83 demonstrates that American citizens and Indian citizens may sue the Indian

government on equal footing.

Therefore, when read together, the Indian Constitution and Code of Civil

Procedure Sections 9, 79, and 83, and the affidavit submitted by Mr. Ravi, Pl.'s Supp.

Br., Ex. A, demonstrate that American citizens "enjoy an equal standing" with Indian

citizens in actions against the Indian government.  *Nippon Hondo Co.*, 285 F.2d at 767-78.  The court thus concludes that the Reciprocity Act does not bar Mr. Ravi's contract claims in this court.

 **B.**  **The Sovereign Capacity Doctrine Bars Mr. Ravi's Contract Claims**

   While the government has moved to dismiss Mr. Ravi's contract claims, or for summary judgment, on three grounds, this opinion will focus only on the government's argument based on the sovereign capacity doctrine that Mr. Ravi's claims should be dismissed for lack of subject matter jurisdiction under RCFC 12(b)(1).  As discussed below, under the sovereign capacity doctrine, the court must dismiss Mr. Ravi's contract claims.

   **i.**  **Legal Standard Under RCFC 12(b)(1)**

   When deciding a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), the court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the plaintiff's favor. *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  The plaintiff bears the burden of establishing subject matter jurisdiction, and must do so by a preponderance of the evidence.  *Id.*  If the court determines that it lacks subject matter jurisdiction, it must dismiss the plaintiff's action.  RCFC 12(h)(3).

   **ii.**  **The Sovereign Capacity Doctrine**

   The Court of Federal Claims is a court of limited jurisdiction.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  As relevant here, the Tucker Act grants the court jurisdiction over "any claim against the United States founded . . .

upon any express or implied contract with the United States." 28 U.S.C. § 1491. The Tucker Act, however, merely confers jurisdiction on this court, it does not "create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976).

"The contract liability which is enforceable under the Tucker Act consent to suit does not extend to every agreement, understanding, or compact" with the government that "can semantically be stated in terms of offer and acceptance or meeting of minds." *Kania v. United States*, 650 F.2d 264, 268 (Ct. Cl. 1981). As this court has explained, there are "two main categories of contracts that the government makes," which are "often referred to as proprietary and sovereign." *Awad v. United States*, 61 Fed. Cl. 281, 284 (2004). The United States has "generally waived sovereign immunity with regard to proprietary contracts" where "the sovereign steps off the throne and engages in purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves." *Id.* (quoting *Kania*, 650 F.2d at 268).

However, the government has not waived sovereign immunity for—and jurisdiction of the Court of Federal Claims does not extend to—contracts entered into by the government "in its sovereign capacity that do not unmistakably subject the United States to damages in the event of breach." *Trudeau v. United States*, 68 Fed. Cl. 121, 127 (2005) (citing *Kania*, 650 F.2d at 268; *Silva v. United States*, 51 Fed. Cl. 374, 377 (2002), *aff'd*, 51 F. App'x 12 (Fed. Cir. 2002)), *aff'd*, 186 F. App'x 998 (Fed. Cir. 2006); *see also Awad*, 61 Fed. Cl. at 284. Under the sovereign capacity doctrine, this court "generally . . . does not possess subject matter jurisdiction over agreements made in the course of

criminal proceedings," *Silva*, 51 Fed. Cl. at 377, or over agreements made by the government in "administering the criminal justice system," *Sadeghi v. United States*, 46 Fed. Cl. 660, 662 (2000).  So, for example, this court has declined to exercise jurisdiction over contracts arising out of the government's criminal enforcement actions, such as "plea agreements, immunity agreements, and witness protection agreements," *Trudeau*, 68 Fed. Cl. at 128 (citing cases), unless those agreements "clearly and unmistakably subject[] the government to monetary liability for any breach," *Aluminum Shapes, LLC v. United States*, 139 Fed. Cl. 709, 713 (2018) (quoting *Sanders v. United States*, 252 F.3d 1329, 1335 (Fed. Cir. 2001)).  This court has applied the same rationale to contract claims arising out of civil enforcement actions because, like criminal enforcement actions, civil enforcement actions "could only be undertaken by the sovereign." *Aluminum Shapes*, 139 Fed. Cl. at 714 (citing *Trudeau*, 68 Fed. Cl. at 129).

Most relevant to this case, this court in *Silva v. United States* held that a contract action arising out of an undercover law enforcement operation was barred by the sovereign capacity doctrine.  51 Fed. Cl. at 377.  *Silva* involved a government operation to expose a scheme to illegally import wildlife.  *Id.* at 375-76.  During the operation, a third party cooperating with the U.S. Fish and Wildlife Service entered into an agreement to care for and feed an illegal importer's birds.  *Id.* at 376.  At the close of the operation, the government confiscated more than 100 exotic birds belonging to the illegal importer. *Id.*  The illegal importer filed a contract-based lawsuit in this court alleging that the government (assumed to be in privity of contract with the importer) should be held liable for the lost value of the birds.  *Id.*  The importer argued that the government had entered

15

into a "commercial agreement" to care for and feed the birds. *Id.* at 377.  Despite what the agreement appeared to be "on its face," the court held that it lacked jurisdiction over the contract action under the sovereign capacity doctrine. *Id.* at 377-78.  The court explained that the purported "commercial agreement" was meant to further "law enforcement operations," which, "without question, lie at the heart of sovereign action." *Id.* at 377 (quotation omitted).

The court recognizes that not all contract claims that are related to a government's sovereign actions will be barred by the sovereign capacity doctrine.  As this court has explained:

> Prisons are related to the sovereign action of incarcerating persons convicted in the criminal justice system.  The act of building the prison is however, not a sovereign act but an act in which the sovereign has stepped off the throne and has engaged in the purchase and sale of goods, lands and services.

*Bailey v. United States*, 54 Fed. Cl. 459, 483 (2002).  The central question in this case is whether the government was acting in its sovereign or proprietary capacity when it entered into the alleged contract with Mr. Ravi for educational services.  *See Trudeau*, 68 Fed. Cl. at 129.

### iii.    Mr. Ravi's Claims Must Be Dismissed Under RCFC 12(b)(1)

Applying the above-discussed standards, the court concludes that Mr. Ravi's claims are barred by the sovereign capacity doctrine and must be dismissed for lack of subject matter jurisdiction.  The undisputed facts demonstrate that the government was acting in its sovereign capacity when it allegedly entered into an educational services contract with Mr. Ravi.  Specifically, the allegations in Mr. Ravi's amended complaint

and the undisputed evidence[6] submitted by the government during supplemental briefing demonstrate that the alleged educational services contract was made in furtherance of an undercover law enforcement operation, a sovereign action.

The allegations in Mr. Ravi's amended complaint state that the purpose of the University of Farmington was to effectuate an undercover law enforcement operation to expose student visa fraud by targeting Farmington enrollees and recruiters. *See, e.g.*, Am. Compl. ¶ 1 (stating that the government "created Farmington in an attempt to expose student visa fraud in the United States"); ¶¶ 3, 10, 31 (referring to the University as a "sting operation"). Mr. Ravi's allegations also confirm that the activities of the HSI agents operating Farmington that form the basis of Mr. Ravi's contract claims, such as enrolling students and accepting tuition payments, were made in furtherance of the goals of that undercover law enforcement operation. *See, e.g.*, Am. Compl. ¶ 8 ("The University of Farmington was a fake university setup by ICE's Homeland Security Investigations and overseen by DHS and was setup to expose student visa fraud. Defendant authorized HSI and/or DHS agents to setup and run the University of

---

[6] The court requested in its supplemental briefing order that the government submit evidence on a variety of issues. Joint Status Report Order, ECF No. 14. Normally, unless jurisdictional facts are in dispute, the court will not look beyond the pleadings when considering a motion to dismiss under RCFC 12(b)(1). *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583-84 (Fed. Cir. 1993). However, in the context of an RCFC 12(b)(1) motion arising out of summary judgment proceedings, the Federal Circuit has held that the court can "consider . . . evidentiary matters outside the pleadings." *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985). Mr. Ravi does not dispute the facts taken from the government's evidence that the court relies on in this opinion.

Farmington scheme, including to enroll students, to accept tuition payments, and to use these contracts with students as a basis to revoke their visa status.").

The undisputed evidence provided by the government likewise shows that the government was acting in its sovereign capacity when undercover agents enrolled Mr. Ravi at Farmington and accepted his tuition payments.  These documents describe Operation Paper Chase, the undercover law enforcement operation involving Farmington that was lawfully certified and reauthorized under 8 U.S.C. § 1363a and 19 U.S.C. § 2081.  Def.'s Appx6-255 (certification and reauthorization documents describing the actions taken by HSI agents in operating the University for Operation Paper Chase).  They explain that HSI agents, in furtherance of Operation Paper Chase and using the lawful authority granted to them under 8 U.S.C. § 1363a and 19 U.S.C. § 2081, established the University of Farmington, enrolled students, and accepted tuition payments.  *See, e.g.*, Def.'s Appx176 (reauthorizing the Operation Paper Chase "undercover investigative operation"), Appx182-83 (describing agents' activities).  The objective of these undercover actions was not to provide students with an education, but "to address[] visa fraud, . . . [t]o identify the full scope of the criminal [student visa fraud] enterprise, to include not only the student visa violators, but also the recruiters and facilitators of the criminal enterprise."  *Id.* Appx15.  The last phase of Operation Paper Chase involved "the prosecution of criminal targets and administrative immigration charges against those aliens who engaged in fraud," including both student visa violators and recruiters.  *Id.* Appx183.

These undisputed facts demonstrate that any alleged educational services contract formed between HSI agents and Mr. Ravi arose out of Operation Paper Chase, an undercover law enforcement operation. The sovereign capacity doctrine bars contract actions that arise out of such lawful "criminal . . . enforcement actions . . . that could only be undertaken by the sovereign." *Aluminum Shapes*, 139 Fed. Cl. at 714. "[U]ndercover law enforcement operations" like Operation Paper Chase have been held by this court to "without question, lie at the heart of sovereign action." *Silva*, 51 Fed. Cl. at 377 (quotation omitted). Under the sovereign capacity doctrine, therefore, Mr. Ravi cannot assert breach of contract and related claims against the government in connection with his alleged educational services contract with Farmington. Based on the undisputed facts before it, the court must dismiss Mr. Ravi's claims for lack of subject matter jurisdiction.

Mr. Ravi argues that the sovereign capacity bar does not apply to this lawsuit for three reasons. First, Mr. Ravi argues that undercover agents were "stepp[ing] off [the government's] throne to engage in the sale of educational services" during Operation Paper Chase. Pl.'s Supp. Resp. at 16-18. Mr. Ravi points out that the operation's certification and reauthorization documents demonstrate that the government engaged in "commercial" activities, such as "creat[ing] a website and market[ing] educational services," "accept[ing] and enroll[ing] . . . international students into a university," and "leasing a building," *id.* at 16-17, which he contends support his argument that the alleged educational services contract was "private" in nature, *id.*

The court disagrees. As the government argues, Def.'s Supp. Reply at 5-6, the only reason the government engaged in the actions that allegedly form the basis of the

purported educational services contract with Mr. Ravi was to effectuate the goals of
Operation Paper Chase.  Undercover agents did not sell educational services to Mr. Ravi;
they were instead authorized to pose as if they did to further a law enforcement operation.
*See, e.g.*, Def.'s Appx111 (describing the purpose of Operation Paper Chase and the
undercover agents' activities).  Even if the alleged educational services contract between
Mr. Ravi and the government could "on its face" appear to be a "commercial agreement,"
the true purpose of the government's conduct was to further "law enforcement
operations" targeting student visa violators, not to provide Mr. Ravi with an education.
*Silva*, 51 Fed. Cl. at 377.  Law enforcement operations "without question, lie at the heart
of sovereign action," *id.* (quotation omitted), and are not susceptible to contract-based
claims in this court.

Second, Mr. Ravi argues that the alleged contract for educational services under
which he attempts to bring this lawsuit was "only tangentially related to carrying out a
law enforcement purpose."  Pl.'s Resp. at 3-4, ECF No. 9.  In support, Mr. Ravi invokes
the prison analogy discussed above to argue that, like the "private" act of building a
prison to serve the sovereign action of incarcerating people, the government engaged in
the "private" act of enrolling students to serve the sovereign objective of Operation Paper
Chase.  Pl.'s Supp. Resp. at 17.  In this case, however, the alleged educational services
contract was not a "private" act "tangentially" connected to the government's undercover
operation.  Rather, the undisputed facts show that enrolling students at Farmington was
fundamental to the goals of Operation Paper Chase, a sovereign action.

Finally, Mr. Ravi in his original response to the government's motion to dismiss relies on *Sommers Oil Co. v. United States*, 241 F.3d 1375 (Fed. Cir. 2001), to argue that the sovereign capacity doctrine does not apply here. Pl.'s Resp. at 4. Specifically, Mr. Ravi argues that, under *Sommers Oil*, the sovereign capacity doctrine does not apply where enforcing the alleged contract with the government "would not disrupt an active criminal case" and "would not requir[e] paying monetary damages for seized contraband." *Id.* This is incorrect. Mr. Ravi later acknowledges that the sovereign capacity doctrine has been applied outside of active criminal proceedings or the seizure of contraband, *see, e.g.*, *id.* at 4 (noting that the doctrine has been applied to "civil enforcement agreements" among others), and Mr. Ravi does not rely on *Sommers Oil* in his supplemental briefing.[7]

In sum, the purported educational services contract on which Mr. Ravi bases his contract claims arises out of a government law enforcement operation, a sovereign action. Under the sovereign capacity doctrine, this court lacks jurisdiction over Mr. Ravi's contract claims, which must be dismissed under RCFC 12(b)(1).[8] The court does not

---

[7] *Sommers Oil* involved a claim for money damages pursuant to an agreement entered into by an informant with the Internal Revenue Service. 241 F.3d at 1377. This court has held that the government can "step off the throne" to secure informant services. *See Yifrach*, 145 Fed. Cl. at 697-98. This case does not involve an informant services contract.

[8] This court has held that even where the government enters into a contract in its sovereign capacity, a plaintiff may assert a contract action if the alleged contract "unmistakably subject[s] the United States to damages in the event of breach" and if a government agent was authorized to enter into the contract. *Trudeau*, 68 Fed. Cl. at 127-128. In this case, Mr. Ravi alleges only that a contract was formed when he obtained an offer of admission to Farmington and paid tuition. Am. Compl. ¶¶ 17, 22, 29-30, 40. Mr. Ravi does not present any evidence to demonstrate or even suggest that his alleged contract with HSI agents afforded him an "unmistakable" right to

address the government's other grounds for dismissal or summary judgment, and the government's alternative motion for summary judgment is dismissed as moot.

### C.    Mr. Ravi's Request for Additional Discovery is Denied as Futile

Although he has not made a formal motion, Mr. Ravi throughout his supplemental response brief requests that the court order additional discovery before ruling on the government's alternative motion for summary judgment so that Mr. Ravi may explore certain material facts that he argues are disputed.  Pl.'s Supp. Resp. at 8-9, 14, 16, 21. The government opposes Mr. Ravi's request because additional discovery would be futile.  Def.'s Supp. Reply at 10 ("Mr. Ravi provides no reason to suspect pre-answer discovery will lead to a different result.").  The court agrees with the government.

RCFC 56(d) permits this court to order additional discovery during summary judgment proceedings when essential facts are not available to the nonmovant.  Rule 56(d)(2) provides that "if a nonmovant [for summary judgment] shows by affidavit or declaration that . . . it cannot present facts essential to justify its opposition, the court may . . . allow time . . . to take discovery."  RCFC 56(d)(2).  Such a motion must articulate "with particularity, what facts the movant hopes to obtain by discovery and how these facts will raise a genuine issue of fact."  *Pfizer Inc. v. United States*, 149 Fed. Cl. 711, 715-16 (2020) (citing *Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1310 (Fed. Cir. 2006)). While motions under RCFC 56(d) are to be "liberally granted," *Jade Trading, LLC v. United States*, 60 Fed. Cl. 558, 565 (2004), the court may deny a motion

---

damages in the event he did not receive educational services.  It is therefore not necessary to reach the question of HSI agents' authority to contract for educational services.

for discovery under RCFC 56(d) if the requested discovery would be futile, *see JEM Transport, Inc. v. United States*, 120 Fed. Cl. 189, 196-97 (2015) (citing, among others, *Simmons Oil Corp. v. Tesoro Petroleum Corp.*, 86 F.3d 1138, 1144 (Fed. Cir. 1996)). This is true even in cases like this one where a formal discovery period has not yet occurred. *Id.*

Mr. Ravi fails to satisfy the requirements of RCFC 56(d). To begin, Mr. Ravi has not complied with the Rule's procedural requirements. He has not provided an affidavit in support of the requests. RCFC 56(d); *Clear Creek Cmty. Servs. Dist. v. United States*, 100 Fed. Cl. 78, 82-83 (2011).

In addition, Mr. Ravi's requests for discovery would be futile in light of the court's holding that the sovereign capacity doctrine presents a jurisdictional bar to Mr. Ravi's contract claims. Mr. Ravi seeks additional discovery for the following reasons: to explore whether Farmington offered "actual classes," Pl.'s Supp. Resp. at 8, to "obtain more names of students, conduct more interviews, and view government records of communications between Farmington officials and students" to determine whether these students were aware of the "pay to stay" scheme, *id.* at 9, to determine whether tuition payments "were used to fulfill Operation Paper Chase objectives," *id.* at 14, to "identify the [ICE] personnel involved" in the operation, *id.*, to "see if the Government also had implied actual authority to enter into" the alleged educational services contract, *id.*, and "to discern which agents made representations to Mr. Ravi," *id* at 16. However, the information requested would not alter the court's decision dismissing Mr. Ravi's contract claims. As discussed above, the undisputed facts demonstrate that the University of

Farmington was a government-created educational institution established as part of a lawful, certified undercover operation to identify and prosecute student visa violators and recruiters engaging in a "pay to stay" visa fraud scheme.  Based these undisputed facts, the court lacks jurisdiction over Mr. Ravi's contract claims under the sovereign capacity doctrine.  The court therefore denies Mr. Ravi's discovery requests as futile.[9]

### D.    Mr. Ravi's Motion to Amend His Complaint is Denied as Futile

Finally, Mr. Ravi has filed a motion to amend his complaint in order to add an additional lead plaintiff, Swetha Batchu.  Mot. to Amend. at 1.  Mr. Ravi asserts that "Ms. Bachu is one of the many who never received educational services after she accepted an offer to pay tuition money in exchange for an accredited educational program."  *Id.*  Mr. Ravi argues that allowing him to add an additional lead plaintiff years into this case "would serve justice and promote judicial efficiency."  *Id.*

The government opposes this motion.  Tr. 20-23.  First, the government argues that "the sovereign capacity bar" is decisive, "and if the case is resolved" on that ground, "adding a party is futile."  *Id.* at 21.  Second, the government contends that "there is unfair prejudice and undue delay" in Mr. Ravi's request.  *Id.* The government points out

---

[9]  The court does not read Mr. Ravi's supplemental briefing as requesting jurisdictional discovery.  *See* Pl.'s Supp. Resp. at 21 (stating that "summary judgment" would not be appropriate without additional discovery).  The court may permit discovery to resolve a dispute regarding jurisdictional facts.  *Clear Creek*, 100 Fed. Cl. at 81.  The court, however, "may deny jurisdictional discovery when it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction[.]"  *Nuance Commc'ns, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1235-36 (Fed. Cir. 2010) (quotation omitted).  To the extent Mr. Ravi requests jurisdictional discovery, that request is also denied as futile, because none of Mr. Ravi's requests would provide a basis for this court's jurisdiction.

that this case was filed in 2020, and the parties have completed two rounds of briefing including "a full merits analysis as to Mr. Ravi's case." *Id.*  To add an additional plaintiff now, the government argues, would make much of this effort and work "for naught." *Id.* at 21-22.  Finally, the government asserts that the motion to amend "seem[s] to be an attempt to prolong" proceedings at a time when the court "is clearly ready to make a decision," which is improper. *Id.* at 22.

Mr. Ravi did not file a reply.

The court agrees with the government and will deny Mr. Ravi's motion to amend as futile.  A party may amend its complaint under RCFC 15(a)(2) with the court's leave, which should be given "freely . . . when justice so requires."  Courts construe this language liberally, and generally grant leave to amend. *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1158 (Fed. Cir. 2014) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  The court, however, should deny leave to amend if there is evidence of delay, bad faith, repeated failure to correct a complaint's deficiencies, undue prejudice to the opposing party, or if the amendment would be futile. *Id.*

"A proposed amendment is futile if it would not survive a motion to dismiss." *Marchena v. United States*, 128 Fed. Cl. 326, 330 (2016), *aff'd*, 702 F. App'x 988 (Fed. Cir. 2017).  "When a party faces the possibility of being denied leave to amend on the ground of futility, that party . . . must proffer sufficient facts supporting the amended pleading that the claim could survive a dispositive pretrial motion." *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1354-55 (Fed. Cir. 2006).  Mr. Ravi has failed to do so here.

Mr. Ravi seeks to amend his complaint to add an additional plaintiff who will assert contract claims for educational services with the government based on the government's law enforcement activities during Operation Paper Chase. *See* Mot. to Amend. at 1.  However, the court has held that it lacks jurisdiction over such claims under the sovereign capacity doctrine.  Because the court would lack jurisdiction over any such claims regardless of the named plaintiff, Mr. Ravi's proposed amendment would be futile, and his motion to amend his complaint is therefore denied.

## V.    CONCLUSION

For the reasons discussed above, the government's motion to dismiss, ECF No. 7, for lack of subject matter jurisdiction under RCFC 12(b)(1) is **GRANTED**.  The government's alternative motion for summary judgment is **DISMISSED AS MOOT**.  Mr. Ravi's requests for further discovery, *see* ECF No. 40, are **DENIED**.  Mr. Ravi's motion to amend the complaint, ECF No. 47, is also **DENIED**.  The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge