# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 20-1237C
(Filed: November 4, 2026*)

| | |
|---|---|
| **RAVI TEJA TIYYAGURA** (a/k/a Teja Ravi), *et al.*, *Plaintiffs*, v. **UNITED STATES**, *Defendant*. | ) |

*Amy E. Norris*, Norris Law Group, PLLC, Washington, DC, for plaintiffs. With her on the briefs were *Anna L. Nathanson*, *Meredith B. Gusky*, *William (Whit) Froehlich*, and *Graner S. Ghevarghese*, Norris Law Group, PLLC, Washington, DC.

*Galina I. Fomenkova*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. With her on the briefs were *Brett A. Shumate*, Assistant Attorney General; and *Patricia M. McCarthy*, Director, and *Eric P. Bruskin*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC.

## OPINION AND ORDER

***BONILLA, Judge*.**

Five former enrollees of the University of Farmington seek refunds of the tuition money they paid to the faux institution. They are among approximately 750 enrollees, all foreign nationals, who paid thousands of dollars each to the University of Farmington, purportedly believing it to be an accredited educational institution. In fact, it was the front for an undercover sting operation orchestrated by

* This opinion was originally filed under seal on October 23, 2026, in accordance with the protective order entered in this case. The Court invited counsel to review the decision for any proprietary, confidential, or other protected information and propose redactions. By November 4, 2026, counsel for both parties informed the Court that no redactions were necessary.

United States Immigration and Customs Enforcement (ICE) to investigate student visa fraud. Pending before the Court is plaintiffs' motion for class certification. For the reasons stated below, the motion is denied.

## BACKGROUND

In September 2015, ICE authorized an undercover sting operation conducted by Homeland Security Investigations (HSI) "to identify F-1 non-immigrant student visa violators, as well as to attract transfer students . . . seeking to fraudulently maintain their student visa status without having to attend class or maintain a full course of study," in violation of 18 U.S.C. § 1546.[1] ECF 127-1 at 11. The federal law enforcement investigation—codenamed "Operation Paper Chase" and coordinated with the United States Attorney's Office for the Eastern District of Michigan—targeted student visa violators as well as recruiters and facilitators "to identify the methods and means through which criminal academic institutions communicate with recruiters worldwide."[2] *Id.* at 12; *see also id.* at 46 ("Operation Paper Chase is a[n] HSI . . . investigation targeting [SEVP] schools, Designated School Officials (DSO), private immigration services businesses[,] and other entities who fraudulently utilize the SEVP to endanger national security, commit visa fraud, smuggle and harbor illegal aliens for profit, launder money, and commit other violations of federal law. The investigation is also intended to identify aliens who are exploiting the student visa process and to obtain clarity as to the level and method of student and employment[-]based benefit fraud . . . .").

To facilitate HSI's "introduc[tion] into the underground network of suspected nefarious schools and international recruiters engaging in visa fraud as well as other criminal activities," ICE authorized the creation of a faux university with both an online presence and a brick-and-mortar front.[3] *Id.* at 13. HSI covertly formed a

---

[1] According to the United States Citizenship and Immigration Services (USCIS) website,

> The F-1 Visa (Academic Student) allows you to enter the United States as a full-time student at a[] [Student and Exchange Visitor Program (SEVP)]-certified college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in a language training program. You must be enrolled in a program or course of study that culminates in a degree, diploma, or certificate and your school must be authorized by the U.S. government to accept foreign students.

U.S. Citizenship & Immigr. Servs., *Students and Employment: F-1 Student Visa* (Nov. 20, 2025), *available at* https://perma.cc/6MMV-8WF4. ICE administers the SEVP and maintains the list of certified educational institutions. *See* U.S. Immigr. & Customs Enf't, *SEVP: Schools & Programs*, *available at* https://perma.cc/767J-6KT2.

[2] The undercover sting operation reportedly targeted foreign nationals already in the United States who were predisposed to commit visa fraud rather than facilitate the entry of nonresident aliens.

[3] To this end, ICE exempted the undercover operation from certain federal laws related to leasing space, acquiring and operating proprietary businesses, depositing funds into banks, and using

corporation under the name International Schools of Michigan, Inc., doing business as the University of Farmington, and registered the dummy company with the State of Michigan Department of Licensing and Regulatory Affairs. The state agency approved the entity's operation as a private post-secondary educational institute on November 25, 2015. ICE then designated the University of Farmington a SEVP-certified educational institution "as a means to backstop its identity . . . ." ECF 127-1 at 13; *see* Dep't of Homeland Sec., *SEVP Certified Schools* 259 (Sept. 19, 2018), *available at* https://perma.cc/CPV5-2EDH. The faux institution received its accreditation from the Accrediting Commission of Career Schools and Colleges (ACCSC) on May 13, 2016, allowing for the generation and use of a website with an official .edu domain.[4]

In the interim, undercover HSI criminal investigators rented a storefront in Farmington Hills, Michigan, to act as the brick-and-mortar campus as of May 1, 2016. HSI officials then generated and launched a University of Farmington website and platform on September 30, 2016, to promote the institution and process applications.[5] ECF 127-34; *see, e.g.*, ECF 127-25 at 2–3; *see also* ECF 127-11 at 9 (admission "that at least at one point the website associated with the University of Farmington operation contained a 'student login' feature"). In addition to the manufactured digital footprint, including "a significant and active social media presence,"[6] undercover HSI criminal investigators engaged brokers and recruiters to enroll foreign nationals "seeking out accredited schools that offer immediate work authorization." ECF 127-1 at 108, 161.

---

proceeds to offset expenses. ECF 127-1 at 3 (first citing 8 U.S.C. § 1363a(a)(1)–(4); and then citing 19 U.S.C. § 2081(a)(1)(A)–(B), (a)(2), (a)(3)).

[4] According to the organization's website, "ACCSC is recognized by the United States Department of Education as the designated institutional accrediting body for over 650 post-secondary, trade and technical schools that provide education to over 150,000 students in a wide variety of vocational programs each year." Accrediting Comm'n of Career Schs. & Colls., *About ACCSC* (2026), *available at* https://perma.cc/Y7GA-HDXP. Around this time, the Department of Education revoked the federal recognition of a competing accrediting body (i.e., Accrediting Council for Independent Colleges and Schools), reportedly sending enrollees scrambling to find "accredited schools that offer immediate work authorization." ECF 127-1 at 127; *see* U.S. Dep't of Educ., *Termination of the Accrediting Council for Independent Colleges and Schools (ACICS) as an ED Recognized Accrediting Agency* (Sept. 16, 2026) ("On December 12, 2016, the Secretary [of Education] upheld the decision of the Senior Department Official . . . to cease recognition of the [ACICS] as an agency that can provide schools with a seal of approval for educational quality, which in turn makes schools eligible to participate in federal student aid programs."), *available at* https://perma.cc/M7TD-SV4C.

[5] The University of Farmington website (i.e., www.universityoffarmington.edu) suggested it was founded in the 1950s and boasted it "is a nationally accredited higher education institution and *authorized by the [SEVP] to admit foreign students*." ECF 127-25 at 2 (emphasis added). The faux university represented its current enrollment at 400 students, with 40 full-time faculty and 1,700 alumni. The website advertised a variety of undergraduate and graduate programs.

[6] *See, e.g.*, ECF 127-11 at 8 (Facebook post admission).

Besides creating the illusion of a physical college campus, the storefront rented by undercover HSI criminal investigators

> serve[d] as a facility in which recorded [undercover] meetings c[ould] occur between the [undercover] DSO and students who are in violation of the conditions of their student visa and who are seeking a corrupt school which does not require them to attend classes while allowing them to keep their status . . . .
>
> The [undercover] DSO will attempt to, through a variety of means, contact these students and arrange a face-to-face meeting at the [undercover] facility. The [undercover] DSO will engage in dialogue with the subject seeking to become a student and explain that this school is not a legitimate school and only for those seeking a student visa without requiring them to attend any classes. Those interested in legitimately attending classes as prescribed by their visa classification[] would be referred to a local school which has been vetted by HSI and SEVP.

*Id.* at 13. Indeed, on March 30, 2026, the government file-shared videotape recordings of the above-described meetings between an undercover HSI criminal investigator posing as a University of Farmington official and two named plaintiffs in this case (i.e., Sneha Parthasarathy and Akhil Mohan). *See* ECF 105 at 4; ECF 107.

HSI covertly operated the University of Farmington from the fall of 2016 until January 2019, enrolling over 750 foreign nationals residing in nearly forty states, but never offering or conducting any actual classes or educational programs. *See* ECF 127-11 at 17–19 (admissions "that the University of Farmington did not offer any live classes, online or in person, to enrolled individuals between 2015 and 2019," assign enrollees "academic instructors," "issue any legitimate degrees or course credits," or offer "any actual educational classes or programs for enrolled students"); ECF 127-33 at 4 (admission "that individuals who made payments to the University of Farmington while the operation was live were not promised any classes and did not attend any classes and that the University of Farmington operation did not provide any classes"). Instead, as noted above, undercover HSI criminal investigators posing as University of Farmington officials participated in videotape recorded meetings with recruiters and prospective enrollees at the rented storefront and conducted monitored telephone conversations and corresponded with prospective and current enrollees. *See, e.g.*, ECF 25 at 216 (recorded telephone call between undercover HSI criminal investigator and named plaintiff Ravi Teja Tiyyagura); ECF 105 at 4 (recorded telephone calls and in-person meetings between undercover HSI criminal investigators and named plaintiffs Sneha Parthasarathy, Akhil Mohan, and Rajesh Ghourvani); ECF 129-2 (collection of email correspondence).

Operation Paper Chase netted over $6.5 million in tuition payments and resulted in the arrest and prosecution of eight brokers and recruiters on charges of conspiracy, harboring aliens for profit, and visa fraud, in violation of 18 U.S.C. §§ 371, 1546(a), 1324. *See, e.g., United States v. Kakireddy*, No. 19-20026 (E.D. Mich. Jan. 15, 2019), Dkt. No. 1 (indictment); *United States v. Nune*, No. 19-51643, 2019 WL 6522239 (E.D. Mich. Dec. 4, 2019) (post-conviction litigation); *United States v. Sama*, No. 19-20026, 2020 WL 4474144 (E.D. Mich. Aug. 4, 2020) (same). *See also Yerrapareddypeddireddy v. Albence*, No. 20-1476, 2021 WL 5324894, at *3 (D. Ariz. Nov. 16, 2021) ("In January 2019, ICE permanently shut down [the University of] Farmington and arrested eight brokers and recruiters for visa fraud and other crimes in connection with the Farmington operation." (citation omitted)), *aff'd*, No. 21-17070, 2022 WL 17484323 (9th Cir. Dec. 7, 2022). Additionally, hundreds of enrollees were either administratively removed under 8 U.S.C. § 1227(a)(1)(C)(i) or voluntarily self-deported.

The named plaintiffs, all citizens of the Republic of India, are five former enrollees of the University of Farmington: Ravi Teja Tiyyagura,[7] Swetha Bachu, Rajesh Ghourvani, Akhil Mohan, and Sneha Parthasarathy. Mr. Tiyyagura entered the United States on an F-1 Nonimmigrant Student Visa on August 25, 2015, to attend Northwestern Polytechnic University (n/k/a San Francisco Bay University) in Fremont, California. After purportedly completing his master's degree in electrical engineering, Mr. Tiyyagura began working for an IT services, consulting, and staff augmentation firm under USCIS's Optional Practical Training (OPT) for F-1 Students temporary employment program.[8] Nearing the end of his OPT eligibility, Mr. Tiyyagura began researching graduate education programs in the United States. He was "referred to the University of Farmington by a recruiter, a person who was an acquaintance." ECF 127-20 at 2. Mr. Tiyyagura initially applied to the University of Farmington via email on December 7, 2017. He followed up five days later, concerned his OPT eligibility was ending in January 2018. Then, on February 14, 2028, Mr. Tiyyagura's recruiter, Avinash Thakkallapally, forwarded Mr. Tiyyagura's completed application to the University of Farmington along with a copy of the applicant's passport and visa.

---

[7] For clarity, the plaintiff's legal name is Ravi Teja Tiyyagura. Throughout the pendency of this matter, he is also identified as Teja Ravi.

[8] According to the USCIS website,

> [OPT] is temporary employment that is directly related to an F-1 student's major area of study. Eligible students can apply to receive up to 12 months of OPT employment authorization before completing their academic studies (pre-completion) and/or after completing their academic studies (post-completion). However, all periods of pre-completion OPT will be deducted from the available period of post-completion OPT.

U.S. Citizenship & Immigr. Servs., *Optional Practical Training (OPT) for F-1 Students* (Nov. 25, 2025), *available at* https://perma.cc/N3MQ-YTDH.

In a form letter dated February 15, 2018, addressed to Mr. Tiyyagura but sent to his recruiter (Mr. Thakkallapally), Mr. Tiyyagura was admitted to the University of Farmington "for the Spring 2017 [sic] Quarter, Session [O]ne, beginning March 5, 2018." *Compare* ECF 127-6 (admission letter), *with* ECF 127-9 (form letter). By invoice dated February 21, 2018, the University of Farmington requested payment from Mr. Tiyyagura of $1,000 for "Initial Attendance/I-20 Issuance" and an additional $1,500 for "Tuition, Spring Term 2018." ECF 127-16 at 6. Thereafter, on May 30, September 6, and December 7, 2018, the faux institution sent Mr. Tiyyagura $2,500 invoices for the ensuing Summer Term 2018, Fall Term 2018, and Winter Term 2018, respectively. *Id.* at 7–9. Between February 26, 2018, and January 6, 2019, Mr. Tiyyagura remitted a series of credit card payments totaling $10,000.[9] ECF 25 at 218–26; ECF 127-16 at 2–3, 5; ECF 127-20 at 3; ECF 24-2 at 10. After receiving his initial payment of $1,000, an undercover HSI criminal investigator issued Mr. Tiyyagura an ICE Form I-20 (Certificate of Eligibility for Nonimmigrant Student Status) on March 2, 2018, to renew his F-1 Nonimmigrant Student Visa or secure an H-1B Specialty Occupation Visa. ECF 127-17 at 8–10.

Mr. Tiyyagura maintains his recruiter (Mr. Thakkallapally) and officials at the University of Farmington were largely non-responsive to his efforts to engage about class schedules and interest in transferring to another school between March and October 2018. On October 18, 2018, USCIS sent Mr. Tiyyagura's employer a formal Request for Evidence requesting documentation supporting his H-1B Specialty Occupation Visa application. In response to Mr. Tiyyagura's November 8, 2018 email to the University of Farmington requesting the USCIS data, an undercover HSI criminal investigator responded the next day:

> Please send all transcript requests to [email].edu. Please allow 3–4 weeks to process your request for transcripts. Because you are enrolled under the "special arrangement" and have not been attending any classes since your admission here, we have to deceitfully make up these classes/documents for you.
>
> Please remember to keep this "special arrangement" to yourself so neither you [n]or the school gets into trouble because it is illegal.

ECF 129-2 at 2. During a follow-up telephone call, Mr. Tiyyagura claims an unidentified University of Farmington official "told [him] to make up fake grades and send them to [the school]." ECF 127-20 at 4. An audio recording of the November 9, 2018 telephone call (file-shared by the government on July 2, 2021) suggests Mr. Tiyyagura was complicit, responding "ok" and "definitely" to the undercover HSI

---

[9] *But see* ECF 1 at 3, 6, 7 (complaint alleging Mr. Tiyyagura "paid $12,500 in tuition"); ECF 8 at 3, 6, 7 (same for first amended complaint); ECF 48 at 3, 7, 8 (same for second amended complaint); ECF 67-1 at 3, 6, 8 (same for third amended complaint); ECF 129-1 at 3 (Tiyyagura interrogatory response declaring he "sustained $12,500 in compensatory damages from loss of tuition money"). ECF 67 is styled as the "second amended complaint," but it is the third amended complaint filed by plaintiffs.

criminal investigator's statements that Mr. Tiyyagura had to send in a list of classes and grades he wanted to see on his requested transcript under their special arrangement. *See* ECF 24-2 at 10 (citing ECF 25 at 216).

On January 30, 2019, Operation Paper Chase transitioned into an overt operation, whereby ICE/HSI launched nationwide raids and sweeps and began arresting and detaining hundreds of foreign nationals and placing them into removal proceedings. Concomitantly, the United States Attorney's Office for the Eastern District of Michigan unsealed indictments against eight recruiters, including Mr. Thakkallapally (i.e., Mr. Tiyyagura's recruiter). *United States v. Thakkallapally*, No. 19-20026 (E.D. Mich. Jan. 30, 2019), Dkt. No. 10 (order to unseal indictment).[10] Mr. Tiyyagura returned to India the next day.

As depicted in the chart below, the four other named plaintiffs claim similar engagements with the University of Farmington.

| Name | Admitted | Invoice Dates | Total Payments |
|---|---|---|---|
| Swetha Bachu | Jan. 23, 2018 | Jan. 29, 2018 to Nov. 2018 | $10,000[11] |
| Rajesh Ghourvani | Jan. 4, 2018 | Jan. 24, 2018 to Nov. 5, 2018 | $10,000 |
| Akhil Mohan | Oct. 16, 2017 | Feb. 12, 2018 to Nov. 9, 2018 | $10,000 |
| Sneha Parthasarathy | May 18, 2017 | May 2017 to Dec. 4, 2018 | $17,500[12] |

As with Mr. Tiyyagura, after making their first payment, each enrollee received an ICE Form I-20 from the University of Farmington.[13] When Operation Paper Chase transitioned to an overt operation, Ms. Bachu was arrested by ICE agents and detained for forty-five days before being granted voluntary departure to India. Mr. Mohan voluntarily returned to India after consulting an immigration lawyer and speaking with a USCIS agent. Ms. Parthasarathy and Mr. Ghourvani presumably voluntarily returned to India when they learned of the true nature of the University of Farmington. *See generally* ECF 127-23; ECF 127-24.

Mr. Tiyyagura filed this breach of contract action, pled as a class action complaint on behalf of himself and similarly situated enrollees of the University of

[10] Mr. Thakkallapally eventually pled guilty to a conspiracy charge and was sentenced to fifteen months in prison.

[11] *Compare* ECF 127-21 at 3–4 (declaring payment of "tuition and fees in the amount of $10,000" and asserting that the "tuition invoices are . . . attached"), *with* ECF 127-14 (attaching one tuition invoice for $2,500).

[12] *Compare* ECF 127-23 at 2 (declaring payment of "$17,500 total in tuition and fees" and referencing "a tuition invoice for $2,500" following a May 18, 2017 admission to the University of Farmington), *with* ECF 127-12 at 2–7 (attaching four tuition invoices for $2,500, the first dated March 5, 2018).

[13] The record presented does not appear to include an ICE Form I-20 for Mr. Ghourvani. Instead, the record includes (perhaps inadvertently) the relevant forms for Prudhivi Raj Gundabathula. ECF 127-17 at 11–22, 44–46. If the two are the same person, the Court was not so advised.

Farmington, on September 21, 2020.[14] The complaint, as amended, contends that the University of Farmington entered into an enforceable contract for educational services with each enrollee when the institution processed their application, sent an offer of admission and tuition invoice, and accepted the enrollee's remitted payments. The operative complaint further alleges that the named plaintiffs and the other members of the putative class were not aware the University of Farmington was a front for an undercover sting operation orchestrated by ICE/HSI. That duly authorized ICE officials sanctioned the means employed in Operation Paper Chase, the argument goes, underscores the enforceability of the contracts alleged. The named plaintiffs charge that the government's failure to provide the educational services offered to each enrollee constitutes a breach of the express terms of the contracts as well as the implied covenant of good faith and fair dealing.

On March 16, 2022, this Court dismissed the complaint for lack of subject matter jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC), "conclud[ing] that Mr. [Tiyyagura]'s claims are barred by the sovereign capacity doctrine." *Ravi v. United States*, 158 Fed. Cl. 775, 784 (2022). The Court summarily explained: "the purported educational services contract on which Mr. [Tiyyagura] bases his contract claims arises out of a government law enforcement operation, a sovereign action," over which "this court lacks jurisdiction." *Id.* at 786. On appeal, the United States Court of Appeals for the Federal Circuit reversed this Court's jurisdictional conclusion and remanded the matter for further proceedings. *Ravi v. United States*, 104 F.4th 1359 (Fed. Cir. 2024). Specifically, the Federal Circuit explained that "the money-in-exchange-for-education contract in this case is within the ordinary presumption of the availability of the Tucker Act monetary remedy." *Id.* at 1364 (citing *Kania v. United States*, 650 F.2d 264 (Ct. Cl. 1981)).

Critical here, in remanding the matter, the Federal Circuit noted:

> Mr. [Tiyyagura] concedes that he would not be entitled to recovery for the breach of his alleged contract with the government if he entered into that agreement with the understanding that it was an illegal contract. We agree that illegal contracts are unenforceable. Thus, on remand, the issue of Mr. [Tiyyagura]'s intent when he entered into the contract will be a matter for the [Court of Federal Claims] to decide.

*Id.* at 1368 (first citation omitted; and then citing *United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed. Cir. 1986)).

Due to the intervening death of Judge Nancy B. Firestone, who presided over this litigation from the outset, the case was reassigned to the undersigned on remand pursuant to RCFC 40.1(c). Plaintiffs now propose to certify a class comprised of "[all] persons who enrolled in the University of Farmington from 2015 to 2019 by making

---

[14] The other named plaintiffs were added through a series of amended complaints.

at least one payment to the University after being sent an offer of admission and a tuition invoice." ECF 127 at 9.

## DISCUSSION

### I. Rule 23

Class actions are limited exceptions to the axiom that litigation is prosecuted "by and on behalf of" the named parties to a lawsuit. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). In this Court, the prerequisites for class certification are:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

RCFC 23(a). To maintain a class action, plaintiffs must further show that

> the United States has acted or refused to act on grounds generally applicable to the class[,] . . . that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

RCFC 23(b)(2)–(3). Factors to be considered in resolving the "superior[ity]" portion of that analysis include: "the class members' interests in individually controlling the prosecution of separate actions; . . . the extent and nature of any litigation concerning the controversy already begun by class members; . . . and . . . the likely difficulties in managing a class action." RCFC 23(b)(3)(A)–(D).

Notwithstanding the similarities between RCFC 23 and Federal Rule of Civil Procedure 23, the bar for class certification is substantially higher in this Court than in federal district court. All seven requirements enumerated in RCFC 23 are written in the conjunctive, whereas the requirements to maintain a class action under Federal Rule of Civil Procedure 23(b) are written in the disjunctive. *Compare* RCFC 23(a)–(b) (requirements linked by "and"), *with* FED. R. CIV. P. 23(b) (requirements linked by "or"); *see Oztimurlenk v. United States*, 162 Fed. Cl. 658, 672 (2022). Consequently, failure to satisfy any prong in this Court is fatal. *See Arnhold v. United States*, 166 Fed. Cl. 499, 505 (2023) (citing *Horvath v. United States*, 149 Fed. Cl. 735, 745 (2020)). To prevail, plaintiffs must prove by preponderant evidence that each requirement is met: numerosity, commonality, typicality,

adequacy, general applicability, predominance, and superiority. *Bauer v. United States*, 176 Fed. Cl. 240, 247 (2025) (citing *Oztimurlenk*, 162 Fed. Cl. at 673 (quoting *Wal-Mart*, 564 U.S. at 350)). "In determining whether plaintiffs have carried their burden, the Court must conduct a 'rigorous analysis' and thus may be required to 'probe behind the pleadings' to assess plaintiffs' showing." *Id.* (first quoting *Wal-Mart*, 564 U.S. at 350–51; and then citing *Oztimurlenk*, 162 Fed. Cl. at 673).

## II. Illegal Contracts

As noted above, Mr. Tiyyagura conceded on appeal "he would not be entitled to recovery for the breach of his alleged contract with the government if he entered into that agreement with the understanding that it was an illegal contract." *Ravi*, 104 F.4th at 1368. The same holds true for the other named plaintiffs and each member of the putative class because "illegal contracts are unenforceable." *Id.* (citing *Amdahl*, 786 F.2d at 393); *see Amdahl*, 786 F.2d at 393 ("The courts are bound to strike down illegal contracts. Thus, no damages can be awarded for 'breach' of a nullity." (first citing *Ala. Rural Fire Ins. Co. v. United States,* 572 F.2d 727 (Ct. Cl. 1978); and then quoting *Schoenbrod v. United States,* 410 F.2d 400, 404 (Ct. Cl. 1969))). The Federal Circuit left it to this Court to evaluate each enrollee's intent when they entered into the alleged contract. *Ravi*, 104 F.4th at 1368.

If an applicant to the University of Farmington intended to pay tuition with the understanding that they would not receive educational services but that their enrollment would facilitate the fraudulent extension of their student visas, that is definitionally an illegal contract. *See* 8 U.S.C. § 1101(a)(15)(F)(i) (limiting F-1 visas to "bona fide student[s] qualified to pursue a full course of study and . . . pursuing such a course of study"). Under that scenario—which the government aptly names "pay to stay"—the enrollee has no cognizable breach of contract claim against the federal government. *See Kardoh v. United States*, 572 F.3d 697, 700 (9th Cir. 2009) ("It has long been 'the settled rule that property delivered under an illegal contract cannot be recovered back by any party *in pari delicto*.'" (quoting *United States v. Farrell*, 606 F.2d 1341, 1348 (D.C. Cir. 1979))). Courts have consistently held, for example, that someone who pays money to a government agent to purchase illegal drugs cannot recover the money from the government. As the United States Court of Appeals for the District of Columbia Circuit explained:

> The $5,000 claimed by [plaintiff]'s court suit was paid to a government agent pursuant to what [plaintiff] thought was an illegal contract to purchase heroin. . . . [H]e cannot obtain the aid of a court of law to secure its return. We reach this result not because the money was an instrumentality of the crime, though the fact that the money was involved in a crime figures in the equation, but because it is contrary to public policy to permit the courts to be used by the wrongdoer [plaintiff] to obtain the property he voluntarily surrendered as part of his attempt to violate the law.

*Farrell*, 606 F.2d at 1350, *cited with approval in United States v. Smith*, 659 F.2d 97, 100 (8th Cir. 1981), *and Mantilla v. United States*, 302 F.3d 182, 187 (3d Cir. 2002).

The United States Court of Appeals for the Ninth Circuit, in turn, has applied the *Farrell* rule in the immigration enforcement context. In *Kardoh*, a Syrian national paid $40,000 to an undercover ICE agent posing as a corrupt immigration official in exchange for four forged alien registration cards. 572 F.3d at 698–99. Following his arrest and subsequent deportation, the Syrian national filed suit in the United States District Court for the Northern District of California seeking the return of the money. *Id.* Citing the government's decisions not to prosecute the claimant or initiate forfeiture proceedings, the district court ordered the return of the $40,000. *Id.* at 700. On appeal, the Ninth Circuit reversed, explaining that because the claimant "paid the money at issue here in furtherance of an illegal scheme . . . ordering the government to return the $40,000 to [him] would be contrary to public policy for the reasons expressed in *Farrell*." *Id.* at 701. The appellate court specifically noted that "[a] conviction has not historically been required to establish the illegality of a transaction." *Id.*

In contradistinction, if an applicant to the University of Farmington intended to pay tuition to the University of Farmington in return for educational services, a cognizable contract may have been formed and subsequently breached. *See Angel v. Seattle-First Nat. Bank*, 653 F.2d 1293, 1295–96, 1298 (9th Cir. 1981) (cognizable breach of contract action brought by "innocent victim caught in the middle of [an undercover United States Customs Service sting operation] to trap [art] smugglers" (first citing *Farrell*, 606 F.2d at 1341; and then citing *United States v. Wilson*, 591 F.2d 546 (9th Cir. 1979)); *cf. Aquino v. Mobis Ala., LLC*, 739 F. Supp. 3d 1152, 1188 (N.D. Ga. 2024) ("Although [p]laintiffs eventually became aware that their job duties did not satisfy the TN visa requirements, there are no allegations that [p]laintiffs knew the offer letters, support letters, and TN visa documents were fraudulent at the time they were acquired. The Court concludes that applying *in pari delicto* to bar [p]laintiffs' claims would be an inappropriate use of the doctrine."), *reconsideration denied sub nom., Martinez v. Mobis Ala., LLC*, No. 22-145, 2024 WL 6963842 (N.D. Ga. July 11, 2024).[15]

Thus, the only legitimate prospective class roster in this case would be comprised of those enrollees who genuinely intended to pay tuition to the University of Farmington in exchange for actual educational services. At this juncture, based on the record presented, there is no basis to determine—preliminarily or otherwise—that all enrollees of the University of Farmington (i.e., the putative class proposed) were innocent victims caught up in ICE's undercover sting operation to trap foreign

[15] "The TN nonimmigrant classification permits qualified Canadian and Mexican citizens to seek temporary entry into the United States to engage in business activities at a professional level" under the United States-Mexico-Canada Agreement (f/k/a NAFTA). U.S. Citizenship & Immigr. Servs., *TN USMCA Professionals* (June 4, 2025), *available at* https://perma.cc/D3DB-ZPWS.

nationals seeking fraudulent student visas. Nor does the record presented allow for the precise identification and culling of enrollees who intended to fraudulently secure or extend their student visas. *Compare Yerrapareddypeddireddy*, 2021 WL 5324894, at *6 ("[T]he [certified administrative record] is devoid of evidence that ICE ever . . . 'made a blanket determination that any students who ever enrolled in the University of Farmington knowingly participated in visa fraud.'" (citations omitted)), *with* ECF 24-2 at 6 ("HSI [undercover agents] took steps to ensure that each of the individuals who 'enrolled' and made 'tuition' payments to the University [of Farmington] knew that they would not attend any actual classes, earn credits, or make academic progress toward an actual degree in a particular field of study—that the 'special arrangement' was a 'pay to stay' scheme.").[16] Indeed, as highlighted *supra*, the Court already has been presented with undercover audio or videotape recordings of four of the five named plaintiffs suggesting their complicity in the fraudulent scheme to secure or extend their student visas. To include enrollees who were *in pari delicto* in the putative class impermissibly invites the Court to "aid those whose cause of action is based upon an illegal act." *See Farrell*, 606 F.2d at 1349 (citing cases).

The undersigned struggles to imagine a case more ill-suited for class certification. As this matter proceeds to trial, a key and perhaps dispositive inquiry for each named plaintiff will focus on their individualized intent in applying to, enrolling in, and remitting recurring payments to the University of Farmington. Resolving this critical issue of intent must be examined for each enrollee in the context of the evidence generated during Operation Paper Chase (e.g., documents, videotaped meetings, recorded telephone calls, emails, reports of investigation) and witness testimony. Such highly individualized inquiries are antithetical to class action litigation. While the issue of enrollee intent in this case is "central to the validity of each one of the claims," the question is not "of such a nature that it is capable of classwide resolution." *See Wal-Mart*, 564 U.S. at 350. It would unjustly aid the guilty and prejudice the innocent to bind them into a single class.

For completeness, the Court briefly addresses the seven Rule 23 requirements. There is no need to exhaustively examine each factor in isolation because the same rationale—the need for highly individualized assessments as to each enrollee's intent—applies across the board.

---

[16] *See also* ECF 24-2 at 5–6 (claiming that when "a prospective enrollee would contact University of Farmington directly by phone, email, or walk-in, . . . an HSI [undercover agent would inform the prospective enrollee] that the school did not provide any classes, but that they could be provided [curricular practical training] under a 'special arrangement' to maintain their student status" and that when a "prospective enrollee would correspond with a criminal recruiter, who would then forward their application materials, and sometimes their payment, to the University . . . each prospective enrollee was informed [prior to enrollment] about this 'special arrangement' by their individual recruiter, including that there were no classes available at the University").

1. Numerosity: If several hundred prospective students enrolled with the requisite innocent intent, then the class would likely be sufficiently numerous; but as the number of innocent victims caught up in Operation Paper Chase diminishes, so too does plaintiffs' ability to satisfy this requirement.

2. Commonality: The proposed class in this case shares a common question (i.e., intent), but the question is not of such a nature that it is capable of classwide resolution. *See Fisher v. United States*, 163 Fed. Cl. 178, 183 (2022) ("Common issues predominate only if the issues that can be resolved by generalized proof 'are more substantial than the issues subject only to individualized proof.'" (quoting *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 512 (2d Cir. 2020))).

3. Typicality: Given the evidence proffered by the government suggesting the complicity of four of the five named plaintiffs in illegal activity, the Court doubts they are typical of those students who had legally enforceable contracts with the University of Farmington. *See CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011) ("A class is disserved if its representative's claim is not typical of the claims of the class members . . . .").

4. Adequacy: Similarly, at least four of the five named plaintiffs (as putative class representatives) cannot adequately protect the interests of those enrollees who sought to enter legally enforceable contracts. *See id.* at 726 ("A named plaintiff who has serious credibility problems or who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative.").[17]

5. General Applicability: Plaintiffs must also demonstrate "the United States has acted or refused to act on grounds generally applicable to the class . . . ." RCFC 23(b)(2). In some respects, the government acted similarly to all members of the putative class. But key to the question of intent are the representations made to each enrollee in conversation and correspondence regarding the (lack of) educational services offered by the University of Farmington and the (il)legality and resulting (un)enforceability of the claimed agreements. Such determinations are necessarily individualized.

6. Predominance: Determining intent will require highly individualized inquiries. "If the common question requires a 'detailed, highly individualized inquiry' in order to answer it for each plaintiff, then the predominance

[17] The adequacy requirement also inquires "whether counsel possess the necessary subject matter expertise and experience to competently serve as class counsel." *See Harkins v. United States*, 178 Fed. Cl. 563, 573 (2025). Counsel's steadfast litigation of this complex matter over the course of the last six years, including the successful Federal Circuit appeal, satisfies any exacting standard.

requirement is unmet and class certification is not appropriate." *Harkins*, 178 Fed. Cl. at 574 (quoting *Bauer*, 176 Fed. Cl. at 256).

7. Superiority: A class action here is not "superior to other available methods for fairly and efficiently adjudicating the controversy," RCFC 23(b)(3), because individualized inquiries are ill-suited to class action litigation, *see Harkins*, 178 Fed. Cl. at 574.

Thus, with the possible exception of numerosity and partial exception of adequacy, plaintiffs do not meet any of the RCFC 23 requirements.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for class certification (ECF 127) is **DENIED**.

It is so **ORDERED**.

Armando O. Bonilla
Judge